TIME WARNER ENTERTAINMENT
COMPANY, L.P., Plaintiff,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Defendants.

DISCOVERY COMMUNICATIONS,
INC., et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

Civ. A. Nos. 92–2494 and 92–2558.

United States District Court,
District of Columbia.

Dec. 22, 1992.

Allan Abbot Tuttle, Patton, Boggs &
Blow, Washington, DC, for Discovery Communications, Inc., and The Learning Channel, Inc., plaintiffs.

Theodore Case Whitehouse, Brian Conboy, Willkie, Farr & Gallagher, Washington, DC, Robert D. Joffe, Cravath, Swaine & Moore, New York City, for Time Warner Entertainment Co.

Roy F. Perkins, Jr., Herndon, VA, for Triplett & Associates, Inc.

James Edwin Meyers, Baraff, Koerner, Olender & Hochberg, Washington, DC, for Encore Media Corp.

Paul J. Sinderbrand, Keck, Mahin & Cate, Washington, DC, for Wireless Cable Ass'n Intern. Inc.

MEMORANDUM AND ORDER

JACKSON, District Judge.

In these actions for declaratory judgment and injunctive relief, plaintiffs challenge most of the provisions of the Cable Television Consumer Protection and Com-

petition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460, and certain provisions of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("the Cable Act" or "Acts"), as imposing unconstitutional restrictions on their First Amendment rights of free speech.

Plaintiffs are cable television system owner/operators and programmers. Defendants are the United States and the Federal Communications Commission ("FCC"), the agency to which enforcement of the Acts is committed.[1] A three-judge district court has been convened, as the 1992 Cable Act itself requires, to consider a consolidated general challenge to Sections 4 and 5 of that Act, with hearing on the merits scheduled for March 4, 1993, as to those two sections. These two cases are presently before this single-judge district court on plaintiffs' motions for preliminary injunctive relief with respect to much of the remainder of the two statutes also alleged to be unconstitutional. Specifically, the plaintiffs pray that the defendants be enjoined *pendente lite* from implementing or enforcing sections 3, 7(b)(4)(B), 7(c), 9, 10(d), 11, 15, 19, 24, and 25 of the 1992 Cable Act, and Sections 611 and 612 of the 1984 Cable Act.[2] The federal defendants raise a threshold issue as to the jurisdiction of this Court, and oppose the preliminary injunction sought on the ground that the plaintiffs have satisfied none of the elements requisite to a meritorious application for a preliminary injunction. For the reasons hereinafter stated, this Court concludes that it has jurisdiction to entertain these motions, but it denies all applications for preliminary relief.[3]

## I.

The federal defendants contend that jurisdiction over several of the plaintiffs' claims, specifically, those challenging sections 3, 9, 11(c), 19 and 25 of the Cable Act of 1992, resides exclusively in the court of appeals in accordance with *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984) ("*TRAC*"), in which the D.C. Circuit held that the court of appeals is deemed to have exclusive jurisdiction, pursuant to the All Writs Act, 28 U.S.C. § 1651(a) (1988), to address a complaint of agency *inaction* if the court of appeals is also statutorily vested with exclusive jurisdiction to review any final action taken by the agency. The court of appeals reasoned that its assertion of exclusive jurisdiction while a matter is pending before an agency is necessary to protect its ultimate power of review, because an interim disposition in the district court could delay or deprive the court of appeals altogether of the opportunity for final review when the agency has finally acted. *TRAC,* 750 F.2d at 75–79.

The defendants here observe that, as in *TRAC,* ultimate review of FCC orders issued pursuant to the Cable Act of 1992 rests exclusively with the court of appeals. *See* 47 U.S.C. § 402(a) (1988) (referencing 28 U.S.C. § 2342 (1988)). The defendants therefore contend that, under *TRAC,* this Court may not consider those of the plaintiffs' claims challenging provisions of the Acts which contemplate FCC action, because a finding here that a provision of the Act is unconstitutional would perforce foreclose any agency action, thus depriving the court of appeals of the ability to review any orders the agency might otherwise have issued pursuant to that provision.

This reasoning ignores, however, the jurisdiction of the court of appeals to review

---

1. The Acts effect amendments to the Communications Act of 1934, which commits its enforcement to the FCC. 47 U.S.C. § 151 (1988).

2. The plaintiffs in *Time Warner Entertainment Company, L.P. v. FCC, et al.,* Civil Action No. 92–2494, challenge each of these provisions. The plaintiffs in *Discovery Communications, Inc., et al. v. United States, et al.,* Civil Action No. 92–2558, challenge sections 3, 9, and 19 of the Cable Act of 1992 only.

3. Although numerous interested parties have moved to intervene as defendants in this case, the Court has yet to rule on these motions, and the United States and the FCC are the only defendants presently before the Court. Nevertheless, each defendant-intervenor applicant has been granted leave to participate as *amicus curiae,* and their arguments have been considered by the Court.

decisions of *this* Court, as well as those of the FCC, including those decisions which would have the effect of either prohibiting or postponing action by the FCC pursuant to the Cable Acts, *see* 28 U.S.C. §§ 1291, 1292(a)(1). Moreover, the D.C. Circuit has never held in subsequent cases that *TRAC* precludes a district court from hearing a constitutional challenge to an agency's enabling act merely because the court of appeals ultimately has exclusive jurisdiction over the agency's actions taken pursuant to that act. *TRAC* itself concerned an Administrative Procedure Act challenge to *inaction* by an *agency*, pursuant to legislation the validity of which was never in dispute, as have the subsequent court of appeals decisions following *TRAC*.[4] In contrast, this case involves a direct constitutional challenge to congressional legislation, which, if plaintiffs are correct, could never justify future agency action to implement or enforce it. In the absence of an express holding by the court of appeals to the contrary, this Court must conclude that, notwithstanding *TRAC*, district courts still have original jurisdiction to consider plaintiffs' constitutional claims such as those brought here. *See Ticor Title Ins. Co. v. FTC*, 625 F.Supp. 747 (D.D.C.1986), *aff'd on other grounds*, 814 F.2d 731 (D.C.Cir. 1987).[5]

## II.

 To obtain a preliminary injunction, an applicant must prove that "(1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction." *National Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C.Cir.1991) (citations omitted). A significant failure of proof with respect to any element may warrant the refusal of *pendente lite* relief and require the movant to await the conclusion of the case. *See id.* at 1254–55. This Court concludes that plaintiffs have failed, at this point, to demonstrate a level of irreparable harm of sufficient imminence and moment to require the issuance of a preliminary injunction on any of their claims.[6] Although a First Amendment deprivation presumptively causes irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), the record clearly reveals that no deprivation of defendants' making is presently occurring, and none is likely to occur before the merits of this controversy are decided. To employ a seasonal metaphor, the threat to the plaintiffs at present is spectral. They

---

4. *See, e.g., Oil, Chemical & Atomic Workers International Union v. Zegeer*, 768 F.2d 1480 (D.C.Cir.1985) (APA claim alleging unreasonable delay by the Mine Safety and Health Administration); *International Union, UAW v. Donovan*, 756 F.2d 162 (D.C.Cir.1985) (claim challenging, as arbitrary and capricious, the failure of the Occupational Safety and Health Administration to pass certain regulations).

5. The defendants also question this Court's jurisdiction to entertain plaintiffs' challenges to sections 11 and 19 on "ripeness" grounds, arguing that these matters are not fit for review until the FCC promulgates regulations. At the preliminary injunction stage, however, the ripeness inquiry conflates with the preliminary injunction inquiry, for if the plaintiffs' challenge is premature, *a fortiori* there is no irreparable injury.

6. The Court observes, as to the other elements, only that: (1) while the Cable Acts appear to present significant First Amendment issues, *see City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986), acts of Congress enjoy a presumption of constitutionality, *see, e.g., Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981); *United States v. Watson*, 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976); (2) Prospective intervenor-defendants, as *amici curiae*, have made a persuasive showing that they will suffer equally grave consequences if the Cable Act of 1992 does *not* go into effect promptly; and (3) while it is always in the public interest to vindicate important constitutional rights, *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir.1984), Congress is presumed to legislate in the public interest. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179 n. 12, 101 S.Ct. 453, 462 n. 12, 66 L.Ed.2d 368 (1980) (citation omitted); *Vargas v. Meese*, 682 F.Supp. 591, 598 (D.D.C.1987).

are haunted by an apparition of regulations yet to come, the shape of which remains to be made manifest. There will be time enough when it is, and when the measure of its menace can be taken, to exorcise it if it truly represents the constitutional evil the plaintiffs perceive.

### Restrictions on Vertically Integrated Programmers

The Cable Act of 1992 directs the FCC to promulgate regulations governing the conduct of "vertically integrated programmers," i.e., those programmers in which a system *operator* has an "attributable interest." Section 19 directs the FCC to prohibit discrimination by vertically integrated programmers in the prices, terms and conditions of delivery of programming to programming distributors. It also directs the FCC to limit the ability of vertically integrated programmers to enter into exclusivity arrangements with system operators. Section 11 directs the FCC to establish limits on the number of channels that vertically integrated programmers can occupy on cable systems.

The plaintiffs, as vertically integrated programmers, challenge these provisions under the First Amendment, contending that the government has singled them out, a single narrow class of "speakers," for discriminatory treatment, has reduced their relative "voice" *vis a vis* other speakers, and has prevented them from reaching their entire audience of choice. None of these asserted injuries, however, has or can occur until the FCC adopts implementing regulations, enters orders for compliance, and imposes sanctions for noncompliance. Although it is certainly more than speculative that the FCC ultimately will take action consistent with the 1992 Cable Act, it has not yet done so, and the form the action ultimately will take is conjectural. Absent evidence of present injury, this Court will not enjoin implementation of a duly promulgated Act of Congress until a constitutional imperative for doing so is indubitable.

### Limitations on Operators' Activities

Section 11 directs the FCC to promulgate rules and regulations establishing limits on the number of subscribers that a cable system operator can reach, and to "consider the necessity and appropriateness" of promulgating regulations limiting the ability of multichannel program distributors to create or produce programming.

Although both of these provisions raise substantial First Amendment issues, *e.g.*, *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), there is, once again, no present First Amendment injury. The plaintiffs argue that the threat of future regulation alone improperly burdens First Amendment freedoms. The plaintiffs' contentions, however, depend on the undemonstrated hypothesis that cable operators will, in advance of any regulations, voluntarily reduce their subscriptions or cease investment in new programming. Furthermore, with respect to the program creation requirements, there is an obvious possibility that the FCC will choose not to adopt regulations. Even if it does, however, the Court cannot consider the appropriateness of the FCC's objectives, or the means used to accomplish those objectives, until the agency makes the threshold decision that regulations are required.

### Municipal Affiliation with Operator Systems

Section 7(c) of the Cable Act of 1992 authorizes local or municipal entities to operate as multichannel program distributors even if the entity is affiliated with the local franchising authority. Such operators do not need to participate in the franchising process. Section 24 of the Act prohibits suits for damages against franchise authorities for improper activity. The private systems operator plaintiffs object to affiliation between the government and operator systems with whom the plaintiffs compete, arguing that the statutory scheme "confer[s] upon government officials the power to abuse regulatory authority for purposes of censoring the communications of private cable operators or punishing them for stances they have taken ... on political

issues...." Complaint, *Time Warner*, C.A. No. 92–2494, at ¶ 160.

The plaintiffs' asserted injuries are entirely speculative. Absent some evidence of actual or impending censorship or retaliation, the Court cannot conclude that there is any present First Amendment deprivation. To the extent that the threat of affiliation between government and operators may be causing self-censorship by operators fearing future reprisal, the Court finds that this danger, if it exists at all, is not of sufficient magnitude to require preliminary relief.[7] *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 491 (S.D.N.Y.1989) (a preliminary injunction "should not issue upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong....").

*Regulation of Rates*

Section 3(a) of the Cable Act of 1992 permits the FCC and local franchising authorities to establish rate regulations for certain cable systems. Operators are required to provide subscribers with a basic service tier on which the operator must carry all section 4 and 5 mandatory carriage stations; all public, educational or governmental stations which must be carried pursuant to a franchising agreement; and all regular broadcast stations provided by the operator. The FCC is directed to promulgate reasonable rates for each operator's basic service tier. Operators may not require subscribers to purchase any service, other than the basic tier, as a precondition to receiving any other pay-per-view or pay-per-channel service. Finally, the operator must use a uniform rate structure throughout the geographic area in which its service is offered.

Many of the provisions in section 3 will not become effective until the FCC promulgates appropriate regulations. Furthermore, the self-executing provisions of section 3 do not become effective until April 4, 1993. *See* Cable Act of 1992 § 3(b). The plaintiffs have failed to demonstrate that the prospect of future regulations or the mere existence of statutory provisions not yet in effect have caused a present First Amendment deprivation.[8] Absent such a showing, preliminary relief is inappropriate.

*"PEG", Leased Access, and Preview Notice Provisions*

Section 7(b) of the Cable Act of 1992, in conjunction with section 611 of the Cable Act of 1984, gives local franchising authorities the power to request in franchise proposals that channel capacity be dedicated to "public, educational, or governmental use," and to demand assurances from operators that such channels will be provided.[9] Once

---

**7.** The Court further notes that the Cable Act of 1992 gives such a competitive advantage, if any, to municipal operators for what appear to be content-neutral purposes, and facially, at least, the statute does not prohibit private operators from attempting to persuade consumers to choose their messages. *See Warner Cable Communications v. City of Niceville*, 911 F.2d 634 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

**8.** Furthermore, any potential for present injury is reduced by the current standstill order in *Turner Broadcasting System, Inc., et al. v. FCC, et al.*, 810 F.Supp. 1308 (D.D.C.1992), Civil Action No. 92–2247, and consolidated cases. That order, by permitting operator noncompliance with section 5 mandatory carriage provisions, eliminates the obligation of operators to carry these stations on the basic service tier.

The cable network plaintiffs argue that the rate regulations will reduce their audience because cable operators will anticipatively move non-broadcast stations, like the Discovery and Learning Channels, to a mid-level premium tier. Declaration of John Hendricks at ¶¶ 20–24; Supplemental Declaration of Dawn McCall, *Discovery Communications*, C.A. No. 92–2558. The Court has doubts as to whether, in advance of regulation, there is current irreparable injury. More importantly, however, any present negative effects felt by the plaintiffs are the result of voluntary activities by nonparty individual operators speculating as to the outcome of this litigation, and are not attributable to any direct activity by the federal defendants. Finally, even if this Court was to issue an injunction, it is not clear that such relief would prevent operators from re-tiering anyway. This doubtfulness of redressibility further counsels against entry of a preliminary injunction. *Accord Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**9.** Section 25 of the Cable Act of 1992 directs the FCC to impose similar requirements on providers of direct broadcast satellite ("DBS") services. Under section 25(b), the FCC must require, as a condition to authorization of any DBS service,

the franchise proposal is accepted, the franchising authority may enforce these PEG requirements. 47 U.S.C. § 531 (1988). The cable operator may not exercise any editorial control over the PEG programming that it is required to carry, *id.* § 531(e), but may specify, in its franchise agreement, that it will not carry obscene programming, *see id.* § 544(d)(1).

Section 612(b)(1) of the Cable Act of 1984 requires cable operators to designate some of their channel capacity for use by commercial programmers that are unaffiliated with the operator.[10] The cable operator may not exercise editorial control over this "leased access" programming, except that it may consider content in establishing a reasonable price to charge the unaffiliated lessee, 47 U.S.C. § 532(c) (1988), and it may enforce a policy of prohibiting programming that the cable operator reasonably believes to be obscene, Cable Act of 1992 § 10(a). Section 9 of the Cable Act of 1992 directs the FCC to determine and establish reasonable rates that operators may charge unaffiliated users, and to establish reasonable terms and conditions for such use.

These provisions, like the "must carry" provisions struck down in *Century Communications* and *Quincy Cable,* raise substantial First Amendment issues. *See, e.g., Century Federal, Inc. v. City of Palo Alto,* 710 F.Supp. 1552 (N.D.Cal.1987). Nevertheless, the plaintiffs have failed to demonstrate immediately impending injury of a magnitude sufficient to warrant a preliminary injunction. Most important, the plaintiffs' claims of irreparable injury are belied by the fact that they have waited

eight years to bring this motion for "emergency" relief.[11] In addition, any PEG obligations incurred by the plaintiff operators are the result of franchises between the operator and the local authority—not the direct result of action by the federal defendants before this Court.[12]

The plaintiffs, and the ACLU as *amicus curiae,* also challenge section 10(d) of the Cable Act of 1992, which eliminates all immunity for cable operators that transmit obscene messages on PEG or leased access channels. The plaintiffs argue that under the current statutory scheme, they may be held criminally or civilly liable for showing programming that they must carry and cannot edit. Although any such imposition of liability without fault may represent questionable legislative policy, in the absence of actual or impending proceedings against the plaintiffs, there is as yet no irreparable First Amendment injury.

Section 15 of the Cable Act of 1992 requires operators to give notice to its subscribers, at least thirty days in advance, if it intends to provide a premium channel—one that offers movies rated X, NC–17, or R—to those subscribers that do not receive the channel. The plaintiffs contend that providing notice will deter operators from showing previews because "it will be very expensive to block such previews from objecting customers." Affidavit of Joseph J. Collins, *Time Warner Entertainment Company,* C.A. No. 92–2494, at ¶ 41. This alleged injury is completely speculative. It is, moreover, largely self-inflicted. The First Amendment does not guarantee that a speaker may force his message upon an

---

that the provider allocate 4 to 7 percent of its capacity to "noncommercial programming of an educational or informational nature."

**10.** *Mid-sized systems must designate 10 percent of their uncommitted stations to such use,* 47 U.S.C. § 532(b)(1)(A) (1988), *large systems must dedicate 15 percent of their uncommitted stations to such use, id.* § 532(b)(1)(B), *and very large stations must dedicate 15 percent of all of their channels to such use, id.* § 532(b)(1)(C).

**11.** To the extent the plaintiffs are only now challenging contracts negotiated pursuant to the

1984 statute, their delay—although perhaps not rising to the level of laches—tends to demonstrate the absence of a need for extraordinary relief. *Accord Costello v. McEnery,* 767 F.Supp. 72, 78 (S.D.N.Y.), *aff'd,* 948 F.2d 1278 (2d Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992).

**12.** With respect to the challenges to the section 25 DBS must-carry requirements, the plaintiff programmers have failed to demonstrate to the Court's satisfaction that they will suffer any first amendment injury before the FCC promulgates regulations.

unwilling captive audience. Offering uninvited previews of programs that may offend some subscribers, in advance of affording the recipients opportunity to refuse them, is a marketing choice plaintiffs have made for themselves. The federal defendants are not driving them to it.

For the foregoing reasons, therefore, it is, this 22nd day of December, 1992,

ORDERED, that plaintiffs' motions for preliminary injunctions seeking to enjoin the defendants from enforcing or implementing sections 3, 7(b)(4)(B), 7(c), 9, 10(d), 11, 15, 19, 24, and 25 of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460, and sections 611 and 612 of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779, are denied; and it is

FURTHER ORDERED, that the parties shall file dispositive motions, and such briefs as may be necessary to supplement the record here on issues relating to the constitutionality of sections of the Cable Acts of 1992 and 1984 other than Sections 4 and 5 of the 1992 Cable Act, in accordance with the Order of December 9, 1992, establishing a briefing schedule with respect to Sections 4 and 5; and it is

FURTHER ORDERED, that oral argument with respect to the constitutionality of such other sections shall be heard by this single-judge district court in conjunction with oral argument before the three-judge district court on Sections 4 and 5 on March 4, 1993.